FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 02, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | NO: 2:16-CV-294-RMP |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| JIM PENA, in his official capacity as Regional Forester of Region Six U.S. Forest Service; UNITED STATES FOREST SERVICE, an agency of the United States; and RODNEY SMOLDON, in his official capacity as Supervisor of the Colville National Forest, | |
| Defendants. | |

Plaintiff, Alliance, challenged the U.S. Forest Service's decision to approve the North Fork Mill Creek A to Z Project ("A to Z Project"), a restoration, logging, and timber sale venture in the Colville National Forest. The U.S. Forest Service contracted with a private entity, Vaagen Brothers, to perform the work. Vaagen Brothers was the only bidder for the contract. As part of the contract, Vaagen Brothers contracted with Cramer Fish Services to perform an environmental

assessment of the project. After reviewing the extensive briefing in this matter, and considering the arguments and law, the Court concludes that the bidding process that the U.S. Forest service used was open and fair, with no conflict of interest among the parties. The Court further concludes that Defendants were not arbitrary and capricious in their environmental analysis of the A to Z Project. Therefore, the Court finds in favor of Defendants and dismisses all of Alliance's claims with prejudice.

## BACKGROUND

Before the Court are Plaintiff's Motion for Summary Judgment, ECF Nos. 103 & 104[1]; a Cross Motion for Summary Judgment, ECF No. 106, by Defendants Jim Pena, Rodney Smoldon, and the United States Forest Service (collectively, "Forest Service Defendants"); and a Cross Motion for Summary Judgment, ECF No. 111, by Intervening Defendants Northeast Washington Forestry Coalition, Pend Oreille County, and Stevens County (collectively, "County Defendants"). The Court heard oral argument on August 22, 2018. Brian A. Ertz and Richard A. Poulin appeared on behalf of Plaintiff Alliance for the Wild Rockies. Rudolf J. Verschoor and Vanessa R. Waldref appeared on behalf of the Forest Service

---

[1] Alliance originally submitted its Motion for Summary Judgment, ECF No. 103, but then submitted a Praecipe, ECF No. 104. This Order will refer to the Praecipe, ECF No. 104, as Plaintiff's Motion for Summary Judgment for all relevant citations.

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 2

Defendants. Lawson Emmett Fite appeared on behalf of the intervening County Defendants.

Plaintiff Alliance for the Wild Rockies ("Alliance") sued the Forest Service Defendants under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, to challenge the Forest Service's decision to approve the North Fork Mill Creek A to Z Project ("A to Z Project"), a restoration, logging, and timber sale venture in the Colville National Forest. *See* ECF No. 100. Alliance alleges violations of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq. Id.*

Specifically, Alliance challenges the Forest Service Defendants' June 13, 2016, Decision Notice and Finding of No Significant Impact ("DN/FONSI") approving the A to Z Project Environmental Assessment. ECF No. 104. The A to Z Project is a proposed project in the Colville National Forest, which is managed in accordance with the Colville National Forest Land and Resource Management Plan ("Forest Plan"). AR 120866. To achieve desired future conditions identified in the Forest Plan, the Forest Service works within the parameters of the Forest Plan to engage in forest restoration, funded through commercial timber harvesting and supporting rural community needs. *See* ECF No. 106 at 2 (citing AR 120875–79; Section 347 of the Omnibus Consolidated Appropriations Act of FY 1999, as amended by Sec. 323 of P.L. 108-7).

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 3

The Forest Service awarded a stewardship contract to Vaagen Brothers Lumber to perform the A to Z Project. AR 124267. As part of the stewardship contract, Vaagen Brothers provided funding for the NEPA-required Environmental Analysis ("EA") of the project. AR 124214. Consistent with the instructions in the A to Z Project Contract requiring the contractor to hire a third party to perform the NEPA work, Vaagen Brothers proposed using Cramer Fish Services ("Cramer") as an independent contractor to complete the NEPA analysis, and the Forest Service approved Cramer's preparation of the A to Z Project EA. *See* ECF No. 87-5 at 3. Cramer assured the Forest Service that no potential conflicts of interest clouded its creation of the A to Z Project EA. *Id.*; *see also* AR 024095–96 (describing the steps taken to prevent a conflict of interest between Cramer and Vaagen Brothers).

On September 6, 2016, Alliance petitioned the Court for a Preliminary Injunction to halt all action on the A to Z Project. ECF No. 12. After receiving briefing from all parties and hearing oral argument, the Court denied Alliance's Motion for Preliminary Injunction. ECF No. 58. The Court also denied Alliance's motion seeking a stay and injunction pending appeal. *See* ECF No. 70. The Ninth Circuit Court of Appeals affirmed the Court's denial of a preliminary injunction. *See Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211 (9th Cir. 2017); ECF No. 92.

The Court has subject matter jurisdiction over this matter pursuant to 28

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 4

U.S.C. § 1331 as a civil action arising under the laws of the United States because Alliance alleges violations of the National Forest Management Act ("NFMA") and the National Environmental Policy Act ("NEPA").  *See* 28 U.S.C. § 1331.

## DISCUSSION

### *Legal Standard for Summary Judgment*

When parties file cross-motions for summary judgment, the Court considers each motion on its own merits.  *See Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  A court may grant summary judgment where "there is no genuine dispute as to any material fact" of a party's prima facie case, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–33 (1986).  Because Alliance's claims arise under the APA, resolution of its claims "does not require fact finding on behalf of [the] court."  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).  The court may direct that summary judgment be granted to either party based upon de novo review of the administrative record.  *See Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1109 (9th Cir. 2010).

### *Statutory Schemes*

The National Forest Management Act, 16 U.S.C. § 1600 *et seq.*, requires the Forest Service to create and maintain land and resource management plans for each national forest.  16 U.S.C. § 1604(a).  Among other requirements, forest plans must

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 5

"provide for diversity of plant and animal communities" as well as "insure that

timber will be harvested from National Forest System lands only where . . .

protection is provided for streams, streambanks, shorelines, lakes, wetlands, and

other bodies of water from detrimental changes in water temperatures, blockages

of water courses, and deposits of sediment, where harvests are likely to seriously

and adversely affect water conditions or fish habitat." *Id.* § 1604(g)(3)(B) &

(E)(iii). "After a forest plan is developed, all subsequent agency action . . . must

comply with NFMA and the governing forest plan." *Ecology Ctr. v. Castaneda*,

574 F.3d 652, 656 (9th Cir. 2009).

The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, "is a

procedural statute intended to ensure environmentally informed decision-making

by federal agencies." *Tillamook Cty. v. U.S. Army Corp. of Eng'rs*, 288 F.3d 1140,

1143 (9th Cir. 2002). NEPA requires agencies to take a "hard look" at the

environmental effects of proposed agency actions. *Klamath-Siskiyou Wildlands

Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). However, the

statute does not mandate particular results. *Tillamook Cty.*, 288 F.3d at 1143.

NEPA's regulations require the agency proposing the action to prepare an

Environmental Assessment ("EA") which "[b]riefly provide[s] sufficient evidence

and analysis for determining whether to prepare an environmental impact

statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). The

EA "[s]hall include brief discussions of the need for the proposal, of alternatives as

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS'
CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ~ 6

required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.* § 1508.9(b). "If, in light of the EA, the agency determines that its action will significantly affect the environment, then an [environmental impact statement] must be prepared; if not, then the agency issues a [finding of no significant impact]." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

### Standard of Review Under the Administrative Procedure Act

The Administrative Procedure Act ("APA") governs over NEPA and NFMA claims. *Ecology Ctr.*, 574 F.3d at 656. Under the APA, agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A) and (E). "Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *De La Fuente v. Fed. Deposit Ins. Corp.*, 332 F.3d 1208, 1220 (9th Cir. 2003) (citation omitted). In determining whether an agency decision is arbitrary and capricious, the United States Supreme Court ruled that

> [r]eview under the arbitrary and capricious standard is deferential; we will not vacate an agency's decision unless it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. We will, however, uphold a decision of less than ideal

clarity if the agency's path may reasonably be discerned.

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)

(internal quotation marks and citations omitted).

### Claims Regarding Selection of Third Party Organizations for A to Z Project

Alliance claims the Defendants violated NFMA and NEPA in selecting third

parties for the A to Z Project. ECF No. 100 at 84–86. Under NFMA, Alliance

claims that the Defendants awarded the Project to Vaagen Brothers "without using

a bidding method insuring open and fair competition." *Id.* at 85. Under NEPA,

Alliance claims that the Defendants' FONSI was tainted by a conflict of interest

created by the decision to outsource the EA's creation to Cramer, paid for by

Vaagen Brothers. ECF No. 104 at 7–8.

### A. Open and Fair Bidding Competition Under NFMA

Alliance argues that Defendants violated NFMA by avoiding an open and

fair bidding competition in awarding the A to Z Project to Vaagen Brothers. ECF

No. 104 at 7–8. The Defendants collectively argue that Alliance lacks standing to

challenge the bidding process. ECF No. 106 at 36–37, ECF No. 111 at 21–23.

Additionally, Defendants argue that even if Alliance has standing to challenge the

bidding process, the competition was open and fair and no statutory violation

occurred. ECF No. 106 at 37–38; ECF No. 111 at 23–24.

### 1. Alliance's Standing to Challenge the Bidding Process

Defendants argue that Alliance lacks standing to challenge the bidding

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS'
CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ~ 8

process, because Alliance was not involved in the bidding process and would not have received the stewardship contract had the process been different. ECF No. 106 at 36–38; ECF No. 111 at 21–23. Alliance argues that it has standing because the contract authorized a third party to conduct the NEPA review, which Alliance claims it has a legal right to ensure, is completed in accordance with the law. ECF No. 112 at 32–33.

Standing is defined as the presence of three elements: (1) the plaintiff has suffered an injury in fact, defined as the violation of a legally protected interest that is concrete, particularized, actual, and imminent; (2) the injury is fairly traceable to the defendants, and not to some other third party; and (3) it is likely the injury is redressable by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

The Ninth Circuit has recognized the "difficult standing problems" presented by challenges to government bidding competitions. *Look v. United States*, 113 F.3d 1129, 1130 (9th Cir. 1997). In *Look*, the plaintiff challenged the fairness of a bidding competition for a computer servicing contract with the United States Army, claiming the Army had illegally excluded foreign firms from the competition. *Id.* at 1130. The plaintiff in *Look* admitted that it would not have received the contract even if the Army had fully considered the foreign firms, as the plaintiff requested. *Id.* at 1131. The Ninth Circuit held that the plaintiff lacked standing because, without showing there was a "substantial" chance in receiving

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 9

the contract had the bidding procedures been different, the plaintiff could not prove that it had suffered an injury fairly traceable to the United States. *Id.*

Under the *Look* analysis, Alliance would not have standing, because Alliance was not a bidder for the A to Z Project contract. As such, it could not claim an injury for unfair bidding procedures because Alliance could not show that there was a substantial chance that it would have received the bidding contract had the procedures been different. *Id.* However, Alliance does not challenge the bidding procedures because it wanted to be awarded the contract that was awarded to Vaagen Brothers; it challenges the bidding process as part of the overall scheme to award the A to Z Project contract to a private entity in violation of NEPA or NFMA requirements. *See* ECF No. 104 at 9–10 ("[B]efore engaging in any NEPA process, Federal Defendants granted exclusive rights to any and all future timber sales in the contract area to Vaagen Bros and allowed Vaagen to select the contractor that would conduct the environmental review."). Alliance claims that it is challenging the government's action as ultra vires in this case and that the bidding competition was "not in accordance with the law" under the APA, because the government failed to ensure that the bidding competition was open and fair, as required by NFMA. 5 U.S.C. § 706(2)(A); ECF No. 112 at 32–33. Alliance claims that its injury in fact, and, therefore, its standing, comes from its procedural rights to challenge government action under the APA, NMFA, and NEPA. ECF No. 112 at 32–33.

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 10

The Ninth Circuit has held that simply claiming that "a defendant violated a statutory duty does not necessarily satisfy the requirements of injury in fact in article III." *Fernandez v. Brock*, 840 F.2d 622, 630 (9th Cir. 1988). The inquiry is whether the statute that was allegedly violated "creates correlative procedural rights in a given plaintiff, the invasion of which is sufficient to satisfy the requirement of injury in fact in article III." *Id.* Mere statutory violations by the government do not give anyone the ability to challenge the government actions; only those plaintiffs with procedural rights may claim the statutory violation as an injury under Article III. *Id.*

Alliance did not bid on the A to Z contract. It does not wish to be awarded the contract and does not claim that it had a substantial chance of receiving the contract. Alliance does not have standing to challenge the bidding competition here because it has not suffered an injury-in-fact. *See Look*, 113 F.3d at 1131.

Further, neither NEPA nor the APA give Alliance standing to challenge the NFMA bidding procedures. As stated above, Alliance argued in its reply brief that its standing to challenge the bidding procedure on the A to Z Project contract "originates in Alliance's procedural rights under NEPA," and when NEPA is allegedly violated, "Alliance has a statutory right to challenge Defendants' action as 'not in accordance with the law.'" [2] ECF No. 112 at 32 (quoting 5 U.S.C.

---

[2] Alliance does not claim that its standing is because Alliance falls within the zone of interest of any statute.

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 11

706(2)(A)).  With this argument, Alliance essentially is claiming that it would have the right to challenge any action as contrary to law because the APA gives it that procedural right.  As stated in *Fernandez*, a mere violation of a statutory duty by an agency does not cause an injury to a plaintiff without some showing that the particular plaintiff had a procedural right under the specific statute in question. *Fernandez*, 840 F.2d at 630.  NEPA and the APA do not give Alliance standing to challenge the A to Z Project contract bidding competition.

Therefore, the Court finds that Alliance lacks standing to challenge the A to Z Project bidding competition.  However, in the event that a reviewing court finds that Alliance does have standing to challenge the bidding competition, the Court will review the merits of Alliance's challenge to complete the record.

### 2. *Alliance's Challenge of the Contract Bidding Competition*

Alliance claims that the government's inclusion of "massive, costly services" in the A to Z bidding competition, including the requirement to fund and complete the NEPA analysis, limited the bidding process to "only those companies with the scale, capacity, and resources to front administrative costs of public land management."  ECF No. 104 at 10.  Additionally, Alliance claims that the contract's awarding of exclusive rights to all timber collected in the North Fork Project Area essentially precludes any competitive bidding that would otherwise happen.  ECF No. 100 at 9–11.  Defendants argue that the bidding was open and fair, but only Vaagen Brothers submitted a bid, and Defendants have no control

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 12

over who does or does not submit a bid.  ECF No. 106 at 36–37; ECF No. 111 at 23–24.

Stewardship contracts under NFMA are contracts with private parties "to perform services to achieve land management goals for the national forests and the public lands that meet local and rural community needs."  16 U.S.C. § 6591c(b). When awarding a NFMA stewardship contract, the bidding method for that contract must "insure open and fair competition."  16 U.S.C. § 472a(e)(1)(A).  In exchange for services under stewardship contracts, the private entity may take "the value of timber or other forest products removed as an offset against the cost of services received under the agreement," with the value of the timber determined "using appropriate methods of appraisal."  16 U.S.C. § 6591c(d)(4)(A) & (d)(4)(B)(i).  If a solicitation for bids on a government contract results in only one submitted bid, the process is still considered open and fair when the government solicits for bids on a wide scale, rather than negotiating with a single company from the outset of the bidding process.  *See Siller Bros., Inc. v. United States*, 655 F.2d 1039, 1045 (Ct. Cl. 1981).

Defendants submitted evidence that the A to Z contract was not immediately or exclusively awarded to Vaagen Brothers.  The record does show that only Vaagen Brothers submitted a bid for the rights to the contract.  ECF No. 22 at 4. Alliance offers no evidence to support that the Defendants brought the contract directly to Vaagen Brothers and ignored the requirement to advertise for an open

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 13

and fair contract bidding competition. In contrast, Defendants' evidence states that the project was advertised to the public, and that the Forest Service sought competitive proposals for the rights to the A to Z Project contract. Rodney Smoldon, the Forest Supervisor for the Colville National Forest, attested that the Forest Service advertised the Project publicly, but only Vaagen Brothers submitted a bid. ECF No. 22 at 1–4. Michael North, a Supervisory Forester in charge of managing stewardship contracts concerning National Forests, attested that the Project was solicited as a request for proposals. ECF No. 26 at 2. There is no evidence that the Forest Service presented the A to Z Project stewardship contract directly to Vaagen Brothers, which would violate NFMA. *See Siller Bros.*, 655 F.2d at 1045. Thus, the Court concludes that even though Vaagen Brothers was the only party to submit a bid, the bidding process was open and fair.

Further, it is well within Defendants' authority to offer all timber sales from the project in the contract to the winner of the contract, which here is Vaagen Brothers. The statutory scheme allows the government to offset the costs of the services performed under the contract with the value of timber and forest products collected from the forest. *See* 16 U.S.C. 6591c(d)(4). Alliance cites no authority stating the arrangement in question violates the NFMA bidding process in any way.

The Court concludes that the bidding process complied with NMFA requirements.

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 14

### B. Conflict of Interest in Contracting NEPA Analysis to Third Parties

Alliance contends that the A to Z contracting arrangement between the Forest Services, Vaagen Brothers, and Cramer created an impermissible conflict of interest under NEPA regulations, arguing this Court should invalidate the EA. ECF No. 104 at 6–9.  Defendants argue that there was no conflict of interest, and any conflict of interest that might be present had no effect on the NEPA analysis. ECF No. 106 at 27–36; ECF No. 11 at 12–19.

Under NEPA regulations promulgated by the Council on Environmental Quality ("CEQ"), "[i]f an agency permits an applicant to prepare an environmental assessment, the agency . . . shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment."  40 C.F.R. § 1506.5(b).  Further, "any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency."  *Id.* § 1506.5(c).  The goal of this selection process is "to avoid any conflict of interest."  *Id.*  If a contractor is used to prepare an EIS, they "shall execute a disclosure statement . . . specifying that they have no financial or other interest in the outcome of the project."  *Id.*

CEQ explained that the conflict of interest provisions in its NEPA regulations are not meant to be interpreted broadly to invalidate several highly capable and competent contractors.  Guidance Regarding NEPA Regulations, 48

Fed. Reg. 34263, 34266 (Council on Envtl. Quality July 28, 1983). Rather, "if the contract for EIS preparation does not contain any incentive clauses or guarantees of any future work on the project, it is doubtful that an inherent conflict of interest will exist." *Id.* If the agency makes a determination that no conflict of interest exists, the court should defer to this finding unless the finding is not supported by substantial evidence. *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 608 (9th Cir. 2018) (citing *Markair, Inc. v. Civil Aeronautics Bd.*, 744 F.2d 1383, 1385 (9th Cir. 1984)).

Even if a conflict of interest does exist, that does not end the analysis; a conflict of interest can be cured by the agency with sufficient oversight over the environmental analysis. *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1128–29 (10th Cir. 1998). "[T]he ultimate question for the court is thus whether the alleged breach compromised the 'objectivity and integrity of the NEPA process.'" *Id.* (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 202 (D.C. Cir. 1991)). Even if an alleged conflict of interest exists, the environmental analysis will not be invalidated unless that conflict of interest had an actual effect on the substantive environmental work done. *Id.*; *see also* 40. C.F.R. § 1500.3 ("[I]t is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.").

Alliance presents several arguments in support of its conflict of interest

claim. First, Alliance claims that the contracting procedures here, in which the Forest Service contracted out the environmental review responsibilities to Vaagen Brothers, who then contracted the environmental assessment responsibilities to Cramer, created an inherent conflict of interest because the arrangement precluded any chance of Cramer finding a significant impact. ECF No. 104 at 9. As Alliance explains, it was in Cramer's best interest not to find a significant impact, because under CEQ regulations, it could not create the EIS because it was not chosen by the Forest Service. *Id.* Second, Alliance argues that the Forest Service Handbook, "which guides the agency's implementation of NEPA, NFMA, and other Federal statutes and rules," prohibits contracting NEPA services in a stewardship contract, such as the one used here for the A to Z Project. *Id.* at 7–8. Third, Alliance argues that by separating the Project into North Fork and Middle/South Fork, the Forest Services created an enforceable promise or guarantee of future work. ECF No. 112 at 25. Fourth, Alliance claims that the Forest Services' alleged oversight on the environmental analysis was insufficient to cure any conflicts of interest. *Id.* at 28.

In response, Defendants argue that there is no actual evidence of a conflict of interest among the involved parties. ECF No. 106 at 30. They argue that the Forest Service Handbook does not have the force and effect of law. *Id.* Further, they claim that, even if there was a conflict of interest, it was cured by the Forest Service's continuous oversight of the environmental review process. *Id.* at 32–36. Last, they argue that Cramer actually was picked by the Forest Service, because the

terms of the A to Z contract required that the Forest Service approve of any third party subcontractor selected to conduct the NEPA analysis. ECF No. 115 at 13–14.

Starting with Alliance's first argument, there is no evidence in the record that the contract arrangement here created an inherent conflict of interest. First, Cramer's selection to prepare the EA followed CEQ regulations. *See* 40 C.F.R. § 1506.5(b) (permitting an agency to select a third party to prepare an EA). There are no express incentives or guarantees of future work noted in the contract, which are the hallmarks of an express conflict of interest. *See* Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263, 34266 (Council on Envtl. Quality July 28, 1983); AR 124208–66. Nonetheless, Alliance insists that it was in everyone's best interest for Cramer to avoid finding a significant environmental impact because Vaagen Brothers already had been awarded the 10-year stewardship contract, and a finding of significant impact would mean conducting a lengthy EIS, which Cramer was not authorized to make and for which Vaagen Brothers would not want to pay. ECF No. 104 at 8–9. However, this argument is speculative at best. Alliance admits that the current arrangement is permissible under CEQ regulations, but only becomes impermissible if the project required making an EIS. *Id.* Without submitting any evidence supporting that the parties purposely avoided finding a significant impact, Alliance's claim does not stand.

Second, the Forest Service Handbook's guidance does not support that a

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 18

conflict of interest exists. The Handbook states that the Forest Service should not use stewardship contracts for environmental analysis, including NEPA analysis. United States Forest Service, Forest Service Handbook § 61.21 Ex. 01 3(a) (2008) ("FSH"). However, the FSH does not have the force and effect of law. *W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896, 902 (9th Cir. 1996). As stated in *Espy*, the FSH governs procedure rather than substance, and it was not created under the APA or other congressional authority. *Id.* As such, the FSH policies do not support the existence of a conflict of interest.

Alliance's third conflict of interest argument is that splitting the A to Z Project into North Fork and Middle/South Fork created a guarantee or promise of future work, which created an inherent conflict of interest. This argument fails for a number of reasons. First, the conflict of interest analysis, including any promises of future work or employment, only applies when an EIS is created. Under the CEQ regulations, the only mention of avoiding conflicts of interest comes in 40 C.F.R. § 1506.5(c), when the regulations discuss a third party creating an EIS. 40 C.F.R. § 1506.5(c). The subsection discussing EAs makes no mention of conflicts of interest. *See* 40 C.F.R. § 1506.5(b). CEQ's guidance on these regulations supports this conclusion. *See* Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263, 34266 (Council on Envtl. Quality July 28, 1983) (discussing how § 1506.5(c), not (b), prohibits any work by a third party with guarantees of future work).

Even though the conflict of interest portion of the CEQ regulations only concern a third party creating an EIS, to any extent that they can be construed to also apply to a third party creating an EA, Alliance's argument still fails. Alliance does not allege that Cramer was guaranteed any future work in the A to Z Project, but rather that the implication of future work existed when the project was split into North Fork and Middle/South Fork. ECF No. 112 at 25–27. This does not create an inherent conflict of interest, as the regulations only prohibit contracts with explicit clauses that guarantee future work or incentives in the outcome of the project. *See* Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34263, 34266 (Council on Envtl. Quality July 28, 1983) ("if the contract for EIS preparation does not contain any incentive clauses or guarantees of any future work on the project, it is doubtful that an inherent conflict of interest will exist"). Alliance's claim that Cramer, Vaagen Brothers, and the Forest Service all implicitly understood that Cramer was guaranteed future work contingent on the outcome of the North Fork EA is too speculative and unsupported to survive summary judgment.

Alliance's final argument is that the Forest Service's failure to oversee the environmental review failed to cure the conflicts of interest in this case. Although the Court finds that there was no conflict of interest, even if there was a conflict of interest, the Forest Service's oversight here cured any effect a potential conflict of interest would have had on the environmental review. Beginning in February of 2014, Cramer provided the Forest Service with biweekly progress reports on the

North Fork EA until it completed the EA in early 2016. *See* ECF No. 107 at 2–10. During this reporting period, the Forest Service repeatedly provided feedback on the EA, which Cramer implemented into the final EA and FONSI. *Id.* This is the type of oversight that ensures the objectivity and integrity of the NEPA process, even if a conflict of interest existed among the parties. *See Ass'ns Working for Aurora's Residential Env't*, 153 F.3d at 1129.

Alliance maintains that the Forest Service's oversight does not cure any potential conflicts of interest because Vaagen Brothers was still involved in the NEPA analysis, even though it promised not to get involved. ECF No. 112 at 29–30. Even if Vaagen Brothers did go beyond the terms of the contract regarding communication with Cramer on its NEPA work, there is no evidence submitted that the communication violated any identified NEPA provisions or regulations.

Alliance did not show a conflict of interest in this case. Even if its evidence had supported a conflict of interest, which the Court does not find, the Forest Service's oversight on the North Fork EA cured any potential conflict of interest. Therefore, the Court finds that there was no violation of NEPA provisions or regulations. Substantial evidence supports the Forest Service's finding that there was no conflict of interest issues in the A to Z Project. *See Cachil Dehe Band of Wintun Indians*, 889 F.3d at 608 (holding agency's determination of no conflict of interest should be upheld unless the determination lacks substantial evidence to support it).

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 21

*Separating the Mill Creek Project into Two Parts*

Alliance argues that Defendants avoided finding a significant environmental impact by improperly separating the A to Z Project into two parts:  North Fork and Middle/South Fork.  ECF No. 104 at 11–14.  Defendants argue that the different sections have independent utility and are separated in time such that a single environmental analysis would be impractical.  ECF No. 106 at 5–9; ECF No. 111 at 24–26.

NEPA regulations require that an agency create a single NEPA review document if multiple projects are connected, cumulative, or similar.  40 C.F.R. § 1508.25.  "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."  *Id.* § 1508.27(b)(7).  To prevail on a claim that an agency improperly segmented a project into multiple environmental analyses, the plaintiff must show that the agency was arbitrary and capricious in failing to prepare a single environmental analysis.  *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).  The identification of the geographic area in which an environmental analysis is conducted "is a task assigned to the special competency of the appropriate agencies."  *Id.* at 414.

When faced with a claim that an agency improperly segmented a greater project into multiple smaller projects to avoid a finding of significant environmental impact, the court first looks to see whether the proposed multiple projects are connected.  40 C.F.R. § 1508.25.  In this context, the Ninth Circuit

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 22

defines "connected" in the negative.  *See Pac. Coast Fed. Of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1098 (9th Cir. 2012).  If two projects would have occurred without the other, then the projects have "independent utility," and are not considered connected.  *Id.*

Alliance does not argue that the North and Middle/South Fork projects are connected.  *See* ECF No. 112 at 6–7 (stating that, while the North and Middle/South Fork projects have independent utility, they still may be cumulative actions).  Therefore, there is no support that these actions are connected.

If two projects are not connected, they still must be analyzed in a joint environmental analysis if they are cumulative.  40 C.F.R. § 1508.25.  "Cumulative" projects are those "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement."  40 C.F.R. § 1508.25(a)(2).  Projects are cumulative when the projects "raise substantial questions that they will result in significant environmental impacts."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998).  Important factors to consider in determining when projects are "cumulative" include whether the actions are a part of the same overall project, are announced simultaneously, are reasonably foreseeable, and are located in the same watershed.  *Id.*  If the details of one project are unknown when the other project is undergoing environmental analysis, the actions are likely not cumulative.  *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d

1105, 1119 (9th Cir. 2000), *overruled on other grounds by Wilderness Soc. v. U.S.*
*Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).  "NEPA does not require the
government to do the impractical."  *Inland Empire Pub. Lands Council v. U.S.*
*Forest Serv.*, 88 F.3d 754, 764 (9th Cir. 1996).

There are some factors present in this case that weigh in favor of finding that
the two projects are cumulative.  Similar to *Blue Mountains*, in which the Ninth
Circuit found that five separate timber sale projects were cumulative: the two
projects here are a part of the same overall project; were sold to the same
contractor at the same time; and are adjacent to each other in the same forest with a
single forest plan.  *See Blue Mountains*, 161 F.3d at 1215.  However, there are
several factors weighing in favor of analyzing the projects in separate
environmental review documents.  The two project areas are separated by a
ridgeline with few overlapping roads or access points.  ECF No. 114 at 3.
Additionally, the two project areas have different creek and stream drainage areas;
will proceed on different timelines; and the specifics about the Middle/South Fork
project, including the timber harvesting areas and other relevant information, had
not yet been identified when work on the North Fork project began.  *Id.* at 4.
Requiring the Forest Service to analyze both of these projects together when key
components of the Middle/South Fork Project had not yet been identified asks the
government to do the impractical.  *See Inland Empire*, 88 F.3d at 764.

Alliance claims that it raises substantial questions because the combined

projects' acreage is more than triple the size of the North Fork project; the total mileage of roads is doubled by combining the two; and the combined volume of timber to be harvested is unknown.  ECF No. 112 at 7.  However, it is unclear how these facts raise substantial questions about the environmental impact that a joint environmental review document would show.  *Blue Mountains*, 161 F.3d at 1215.  Alliance's arguments do not raise "substantial questions" that a joint EA for the North and Middle/South Fork Projects will result in a finding of significant environmental impact.  *Id.*

The Court does not find that Defendants acted arbitrarily or capriciously when they split the Mill Creek Project into the North Fork and Middle/South Fork segments, thereby treating the actions as not connected, cumulative, or similar.[3]  Defendants did not act arbitrarily, capriciously, or contrary to law when they split the A to Z Project into two separate projects.

### Law of the Case

Defendants argue that the rest of Alliance's claims regarding sedimentation and furbearers are barred by the law of the case established by the Ninth Circuit's decision on Alliance's Motion for Preliminary Injunction.  ECF No. 111 at 26–29.

---

[3] Alliance does not argue that the two projects are "similar," so the Court will not analyze whether the projects are similar.  The Court notes that under Ninth Circuit precedent cumulative or connected actions require a comprehensive environmental analysis, but similar actions do not.  *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306 (9th Cir. 2003).

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 25

Alliance argues that the law of the case does not apply because the appellate decision was on a motion for preliminary injunction, and generally preliminary injunction decisions have no effect on the outcomes of a case. ECF No. 112 at 3.

The law of the case doctrine prohibits a court from "reconsider[ing] an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012). The doctrine applies to all questions decided explicitly or implicitly. *Herrington v. Cty. of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993). The law of the case doctrine does not apply when the first decision is clearly erroneous; there is an intervening change in the law; the evidence on remand is substantially different; other changed circumstances exist; or a manifest injustice would otherwise result. *United States v. Renteria*, 557 F.3d 1003, 1006 (9th Cir. 2009). The general rule is that an appellate court's decision on a preliminary injunction motion does not constitute law of the case. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007). Nonetheless, any decisions on pure issues of law are binding. *Id.* "A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal . . . does become the law of the case for further proceedings in the trial court on remand and in any subsequent appeal." 18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478.5 (2002).

Here, the evidence supporting Alliance's Motion for Summary Judgment is

not substantially different from the evidence that Alliance used to support its

Motion for Preliminary Injunction. The Statements of Facts submitted by Alliance

and the Forest Defendants rely solely on the administrative record, which this court

and the reviewing court had access to when they previously ruled on the motion for

a preliminary injunction. *See* ECF Nos. 104-1 & 107. Given the lack of new

evidence presented to the Court, the Ninth Circuit's ruling on the remaining claims

about sedimentation and furbearers constitute the law of the case.

Alliance claims that the current issue is a mixed question of law and fact,

citing *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075 n.5 (9th Cir. 2015). In

*Stormans*, the Ninth Circuit declined to apply the law of the case on an appeal from

a district court bench trial, following the Ninth Circuit's decision to vacate the

district court's order granting preliminary injunction, stating that the Ninth

Circuit's review from the bench trial presented a mixed question of law and fact.

*Id.*

Because this case is a challenge to agency action under the APA, the district

court does not serve as the fact finder. "Rather, the court's review is limited to the

administrative record," to which the parties usually stipulate. *Nw. Motorcycle

Ass'n*, 18 F.3d at 1472. Because a complete administrative record accompanies

motions on administrative claims, prior rulings constitute the law of the case,

absent new evidence previously unconsidered by the appellate court. *See Leslie

Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995) (holding that prior

decisions on APA claims were binding as the law of the case). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration and Naturalization Serv.*, 753 F.2d 766, 769–70 (9th Cir. 1985).

When reviewing Alliance's Motion for Preliminary Injunction using the administrative record, the Ninth Circuit concluded that Alliance's arguments regarding the sedimentation analysis and its cumulative effects, the use of the pine marten's habitat as a proxy for its viability ("habitat as proxy" approach), and the use of the pine marten as a proxy for the fisher ("proxy-on-proxy" approach), did not raise serious questions as to Defendant's compliance with NEPA and NFMA. *See All. For the Wild Rockies v. Pena*, 865 F.3d 1211 (9th Cir. 2017); ECF No. 92. Now, using the same administrative record and presenting the same arguments, Alliance asks this Court for summary judgment, arguing that this is a mixed question of law and fact. ECF No. 112 at 3. However, courts review and rule on administrative claims as a matter of law. *See Occidental Eng'g Co.*, 753 F.2d at 769–70. The same administrative record has supplied this Court with the facts needed to rule on the prior motion for preliminary injunction and the present motions for summary judgment. It is the same record used by the Ninth Circuit when ruling on Alliance's appeal of the motion for preliminary injunction. The evidence is not substantially different. *Renteria*, 557 F.3d at 1006. Therefore,

there is no new evidence presented to this Court that was previously unconsidered in the preliminary injunction phase, and the Ninth Circuit's decision, which were rulings on issues of law, are binding as the law of the case. *See Leslie Salt Co.*, 55 F.3d at 1393.

Nevertheless, the Court will analyze the rest of Alliance's claims on the merits in order to develop a full and complete record for appellate review.

*Sedimentation Claims*

Alliance claims the EA and FONSI failed to consider the project's overall impact on the fish-bearing streams in the project area, arguing the increased sediment levels will negatively impact the streams' fish populations. ECF No. 104 at 14–24. Alliance specifically claims that Defendants impermissibly relied on the net decrease of sediment levels to reach their conclusions, failing to address the short-term effects of a rapid increase in sediment levels at the beginning of the project. *Id.* Alliance also claims that the EA did not adequately address the cumulative impact of the project on sediment in both the North Fork and Middle/South Fork areas. *Id.* Last, Alliance claims the selection of and focus on stream "hot spots" resulted in an uninformed agency decision regarding the sediment level impacts. ECF No. 112 at 12–15. Defendants claim that Alliance misconstrues the impact that the project will have on the sedimentation levels and argue that the project will improve sediment levels in both the short and long terms. ECF No. 106 at 9–15; ECF No. 111 at 29–32.

Starting with the overall impact argument that Alliance makes, it is true that "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). However, the agency can still consider and rely on mitigation measures in finding no significant environmental impact. *See Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993). "[S]o long as significant measures are undertaken to 'mitigate the project's effects,' they need not *completely compensate* for adverse environmental impacts." *Friends of the Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 987 (9th Cir. 1985) (emphasis in original) (quoting *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 860 (9th Cir. 1982)).

Here, Alliance is correct in saying that the project will cause both a significant decrease and significant increase in sediment in the streams at different times. AR 100029. However, as the Hydrology Report states, the sediment reduction benefits from road restoration and maintenance occur first, before the stream sediment levels are increased by logging, hauling, and burning. *Id.* This means, as the EA found, that the sediment levels will be at a net decrease at all times throughout the project, which supports the Defendants' FONSI.

For similar reasons, the argument that Alliance makes regarding the hot spot locations is without merit. Alliance argues that the five "hot spot" locations chosen for monitoring for sediment impact during the A to Z Project will not

mitigate significant environmental impacts to several fish-bearing streams. ECF No. 112 at 8. According to Alliance, the "hot spot" strategy fails to find the complete impact on sediment levels in the project area. *Id.* Defendants recognized in the Hydrology report that "there are other road segments where additional projects could be implemented, albeit with less benefit." AR 099888. Nevertheless, these five hot spots represented the "best sediment reduction opportunities" because "the targeted roads [*sic*] segments delivered large amounts of sediment." AR 100018. While Alliance may raise objections to this mitigation strategy, the record shows that the hot spot strategy should help Defendants lower the sediment levels in the A to Z Project area. *See Friends of the Endangered Species*, 760 F.2d at 987. Therefore, Alliance has failed to show a significant environmental impact.

Alliance argues that the Forest Service's consideration of net decrease in sediment levels was a factor that Congress did not intend for it to consider, as evidenced by the text of 40 C.F.R. § 1508.27(b)(1). Alliance is correct in saying that an agency acts arbitrarily and capriciously when it considers a factor that Congress did not intend for it to consider. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, Alliance's argument fails for two reasons. First, these regulations were promulgated by the Council on Environmental Quality, an executive agency, and not by Congress. Second, section 1508.27(b)(1) does not state that an agency

cannot consider overall mitigation or net benefit data, but rather that a significant impact can exist even if the overall effect is a net benefit. 40 C.F.R. § 1508.27(b)(1). Thus, the Court concludes that the Forest Service did not act arbitrarily and capriciously when relying on the sedimentation net decrease as a factor in its FONSI.

Alliance also claims that the sedimentation analysis failed because it did not address the cumulative sedimentation impact in the North Fork and Middle/South Fork projects together. ECF No. 104 at 21–24. An agency must consider cumulative impacts in a NEPA review. 40 C.F.R. § 1508.25(c)(3). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. To consider cumulative impacts, "some quantified or detailed information is required," and mere general statements about possible effects or risks caused by the project do not constitute the "hard look" that agencies must employ. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir. 1998). But if the determination on cumulative impact is "fully informed and well considered," the court will defer to the agency's finding. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005).

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 32

The North Fork EA included an analysis on the cumulative impacts in both its own project area, and the known impacts on the project area for the Middle/South Fork project, even though less was known about that project when the North Fork EA was being prepared. It considers sediment delivery, stream flow, water quality, soil productivity, fish, special status wildlife, snags and down wood, big game winter range, special status plants, dispersed recreation, and visual quality. *See* AR 104563–673. All of this information meets the "quantified or detailed information" required by NEPA regulations. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1379–80. Nonetheless, Alliance maintains that the consideration of cumulative effects was inadequate. ECF No 112 at 22–23.

While Alliance may be dissatisfied with the agency's conclusion in this case, the Court will not reverse a well-informed agency decision when the decision falls within the agency's expertise and its path to that decision is reasonably discerned. *Nat'l Ass'n of Home Builders*, 551 U.S. at 658. Additionally, Defendants included information about the Middle/South Fork Project that was reasonably known and available at the time that the EA was prepared. The Court will not require the agency to do the impractical, and here, it would be impractical for Defendants to include detailed information on the Middle/South Fork Project when less was known about the specifics of that project at the time that the North Fork EA was being prepared. *See Inland Empire*, 88 F.3d at 764.

The Court concludes that Alliance has failed to raise a genuine issue of

material fact that Defendants' analysis of the impact on sedimentation in the A to Z Project area was arbitrary, capricious, or contrary to law.

**Claims Regarding Impacts on Furbearers**

Alliance claims that Defendants violated NEPA and NFMA by failing to take a hard look at the overall effects the A to Z Project would have on furbearers, specifically the pine marten and fisher. ECF No. 104 at 24–36. Defendants argue that the EA adequately addressed the impact that the project would have on furbearers. ECF No. 106 at 16–26; ECF No. 111 at 32–34.

### A. Monitoring of Pine Marten

Alliance argues that the use of the pine marten as a proxy both for mature-to-old growth habitats and the furbearer fails as a matter of law, and that the EA's attempt to address the impact on pine marten is inadequate and does not comport with the Colville Forest Plan. ECF No. 104 at 30–34. Defendants argue that the use of the pine marten as an indicator species is reasonable, and that the agency should be given discretion in this area. ECF No. 106 at 16–20; ECF No. 111 at 33.

It is common practice under NFMA and NEPA to rely on certain habitats or species as "proxies" for other species as a way to monitor those habitats and species in fulfilling the requirements of a forest plan. *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 949 (9th Cir. 2014). Using a species' preferred habitat as an indicator of the viability of the species itself is called the habitat as a proxy approach. *The Lands Council v. McNair*, 537 F.3d 981, 996–97 (9th Cir.

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 34

2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Using a species as an indicator for another species is called the proxy on proxy approach. *Friends of the Wild Swan*, 767 F.3d at 949. Proxy approaches are permissible if they reasonably ensure accurate results. *Id.*; *Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 972 (9th Cir. 2002). If the proxy results do not mirror reality, the Forest Service cannot rely on proxies to monitor species or habitats. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004).

Alliance relies heavily on one Ninth Circuit case to support its argument that the pine marten monitoring strategies employed here are arbitrary and capricious. In *Native Ecosystems Council v. Tidwell*, the Ninth Circuit held that the "proxy-on-proxy approach's reliability is questionable where the [management-indicator species] is absent from the project area." 599 F.3d 926, 933 (9th Cir. 2010). Because the pine marten has been absent from the project area for a number of years, Alliance argues that the analysis of the A to Z Project's effect on the pine marten is inadequate and must be revisited to evaluate significance. ECF No. 104 at 32–34.

However, this argument was already rejected by the Ninth Circuit. The Ninth Circuit found that the Colville Forest Plan does not actually require population monitoring of the pine marten. *Pena*, 865 F.3d at 1218. Additionally, "absence of the management indicator species on the project site does not

necessarily invalidate a proxy analysis." *Id.* at 1219. Under *Tidwell*, the Ninth Circuit explained, a proxy analysis is inappropriate when (1) the management indicator species is absent from the area; (2) the species is not difficult to monitor; and (3) a flaw in the Forest Service's analysis invalidated the proxy approach. *Id.*

Using the *Tidwell* factors, the Ninth Circuit found that, despite the pine marten's absence from the project area, the proxy analysis was still permissible under NEPA and NFMA. *Id.* First, there were still some reported pine marten sightings in other parts of the Colville National Forest, albeit outside the project area. *Id.* Second, the EA implied that the pine marten was difficult to detect, proving that it was permissible to resort to a proxy-monitoring method instead of direct monitoring. *Id.* Third, Alliance was unable to show a flaw in the Forest Service's pine marten monitoring techniques or analysis that would undermine the Forest Service's decision to use a proxy monitoring approach. *Id.* For these reasons, the Ninth Circuit found the pine marten proxy analysis permissible. *Id.*

While this Court is analyzing the merits of Alliance's claims, notwithstanding the law of the case created by the Ninth Circuit's order on Alliance's motion for preliminary injunction, Alliance presents the same proxy argument here that it did to the Ninth Circuit. ECF No. 104 at 30–34. It relies on the same case, *Tidwell*, and argues again that the Forest Service's use of the pine marten as a proxy was improper and that its other monitoring efforts were inadequate. *Id.*; ECF No. 112 at 33–44. The Court is not persuaded by Alliance's

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 36

arguments that already were rejected by the Ninth Circuit. Therefore, the Court

finds that Alliance's claims regarding the pine marten and proxy monitoring

approaches fail as a matter of law.

### B. Impact on Fisher

In some ways similar to its claims involving the pine marten, Alliance

argues that the EA's analysis regarding the project's impact on the fisher, also a

furbearer, was inadequate, and that the project's impact on the fisher is unknown.

ECF No. 104 at 24–30. Under NFMA, Alliance claims the monitoring of the fisher

violates the Colville Forest Plan because the fisher's habitat is significantly

different from the pine marten's habitat. *Id.* at 24–30, 34–36. Under NEPA,

Alliance argues that Defendants need to take a "hard look" at the effects that the

project will have on the fisher. *Id.* at 26–27. Defendants contend that the fisher

was adequately accounted for in the EA, arguing that they have met the

requirements of both NEPA and NFMA. ECF No. 106 at 16–23; ECF No. 111 at

33–34.

First, Alliance's objection to Defendants' use of a "proxy as proxy"

approach to monitor fishers fails as a matter of law. This argument already was

rejected by the Ninth Circuit. *Pena*, 865 F.3d at 1219–20. Second, Alliance

argues that the pine marten is not an appropriate proxy for the fisher because the

fisher's habitat is different from the pine marten's habitat. ECF No. 104 at 25–26.

But as Defendants point out, the studies relied upon in the EA, and Alliance in its

arguments, show that the fisher and marten's preferred habitats are substantially similar. ECF No. 106 at 17–18 (finding that fishers' preferred elevation and the project area elevation are similar), 18–19 (finding both the fisher and the marten prefer mature and old growth in trees of moderate to high elevation). And while the fisher may require larger ranges than the marten altogether, this does not change the two furbearers' preference for mature to old growth. The Court concludes that Alliance failed to raise a genuine issue of material fact that Defendants acted arbitrarily and capriciously, or failed to give a hard look to the effect on the fisher.

Last, Alliance claims that, under the Colville Forest Plan, the fisher is a species that needs to be monitored on its own, rather than using the pine marten as a proxy. ECF No. 104 at 28–30. The part of the Forest Plan on which Alliance relies sets out certain factors that led the Forest Service to designate species as proxies for other species, like the pine marten is to the fisher. *Id.* at 28. The management indicator species factors include endangered animal species; species with special habitat needs; species commonly hunted or trapped; and species that indicate effects on other, similar species. *Id.* However, these parts of the Forest Plan do not state that species must be considered management indicator species if one or more of these factors are met, but that these factors played a role in the Forest Service's designation process. *Id.*

The Court rejects Alliance's challenge regarding the Colville Forest Plan for

not designating the fisher as an indicator species, because the time for challenging the Colville Forest Plan has long passed. The Colville Forest Plan was adopted in 1988. The time for challenging the Forest Plan ended in 1994. 28 U.S.C. § 2401(a).

Alliance cites *Neighbors of Cuddy Mountain v. Alexander* to prove that it does not challenge the Forest Plan in its argument that the fisher should be its own management indicator species. 303 F.3d 1059 (9th Cir. 2002). In *Alexander*, the plaintiffs appealed from a district court order dismissing its complaint because the district court concluded that their claims were not ripe under the APA because they failed to challenge final agency actions. *Id.* at 1066–67. Plaintiffs challenged a timber sale on national forest land in Idaho under NFMA, NEPA, and the APA. *Id.* at 1061. The Ninth Circuit reversed the district court's ruling, finding that the plaintiffs did challenge final agency action because "[w]here the Forest Service generally fails to comply with NFMA and the governing Forest Plan . . . this Court has power, under the APA, to review the [action] and conclude that its approval was unlawful." *Id.* at 1067.

*Alexander* is distinguishable and thus is not controlling. *Alexander* involved a ripeness challenge by the defendants, under the doctrine articulated in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) stating that plaintiffs cannot challenge actions for violating NFMA or a Forest Plan unless it is connected to a specific sale or project. *Alexander*, 303 F.3d at 1067. Here, Alliance's claim regarding the

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 39

fisher is different from the claims in *Alexander*.  Alliance argues that the Forest

Service violated the Colville Forest Plan by failing to designate the fisher as a

species that needs to be monitored on its own, rather than through the pine marten

as an indicator species.  ECF No. 104 at 28.  Alliance supports its argument with

the factors that the Forest Service considered when identifying indicator species for

the Colville Forest Plan when the plan was first created.  *Id.*  Using these factors,

Alliance argues that the fisher meets the criteria to be a species monitored on its

own, and thus a failure to monitor the fisher on its own violates the Colville Forest

Plan.  *Id.*

However, in making this argument, Alliance challenges the monitoring

strategies set by the Colville Forest Plan.  When Defendants analyzed the potential

environmental impact on the fisher using the pine marten as a proxy, they followed

the monitoring strategies imposed by the Colville Forest Plan.  To argue that

Defendants should have monitored the fisher on its own, using the factors the

Forest Service considered in creating the Forest Plan over twenty years ago, is an

untimely challenge to the Forest Plan.  These arguments are far different than the

arguments the plaintiffs made in *Alexander*, in which the plaintiffs argued that the

Forest Service failed to follow the terms of the forest plan implicated in that case.

*Alexander*, 303 F.3d at 1061.  Here, Alliance wants this Court to conclude that

Defendants acted improperly by not updating the Forest Plan based on factors the

Forest Service considered in creating the fisher's monitoring strategy years ago.

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS'
CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ~ 40

ECF No. 104 at 28.  Alliance therefore challenges the Forest Plan, which is untimely.

The Court concludes that Alliance failed to raise a genuine issue of material fact that Defendants acted arbitrarily and capriciously regarding the furbearer analysis under NEPA and NFMA.

### Abandoned Claims

Alliance did not attempt to argue or preserve other claims from its amended complaint.  ECF No. 100.  The other claims not mentioned in this current motion for summary judgment include claims regarding the effects on or involving grazing; climate change; cavity excavators; northern goshawk; wolverines; big game habitat; and soil productivity.  *Id.*  The Forest Service Defendants argue in their Motion for Summary Judgment that Alliance's failure to address the above-mentioned claims constitutes a waiver of those claims.  ECF No. 106 at 38. Alliance did not respond to the allegation that it waived these claims.  *See* ECF No. 112.

When a plaintiff fails to respond to arguments in a motion for summary judgment, the plaintiff is considered to have abandoned those claims.  *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005); *see also Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995).  Further, the failure to respond to arguments in motions may be deemed consent to the entry of an adverse order.  LR 7.1(d).  By failing to assert or defend its remaining claims, Alliance

ORDER GRANTING DEFENDANTS' AND INTERVENING DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ~ 41

waived the rest of its claims in its Amended Complaint.

## CONCLUSION

The Court grants summary judgment to Defendants on all of Alliance's claims. Alliance's claims are dismissed with prejudice.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Summary Judgment, **ECF No. 103**, is **DENIED.**

2. Defendants Jim Pena, Rodney Smoldon, and the United States Forest Service's Cross Motion for Summary Judgment, **ECF No. 106**, is **GRANTED.**

3. Intervening Defendants Northeast Washington Forestry Coalition, Pend Oreille County, and Stevens County's Cross Motion for Summary Judgment, **ECF No. 111**, is **GRANTED**.

   **IT IS SO ORDERED**. The District Court Clerk is directed to enter this Order, provide copies to counsel, **enter judgment for all Defendants,** and **close this case.**

   **DATED** October 2, 2018

*s/ Rosanna Malouf Peterson*

ROSANNA MALOUF PETERSON
United States District Judge
